COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NOS. 2-05-473-CR

        2-05-474-CR

CRAIG MITCHELL STAGGS APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

In three points, appellant Craig Mitchell Staggs appeals his convictions for aggravated sexual assault of a child, indecency with a child, and bail jumping.
(footnote: 2)  We affirm.

BACKGROUND

Appellant was indicted and tried on four counts of aggravated sexual assault of a child and two counts of indecency with a child.  After a mistrial, he was retried in September 2005 on three counts of aggravated sexual assault of a child, two counts of indecency, and one count of bail jumping.
(footnote: 3)  He pled not guilty to all of the charges and true to a repeat offender allegation based on a prior conviction in Florida for attempted sexual battery.  The jury found him guilty of all charges.  The judge sentenced him to confinement: thirty years for each of the aggravated sexual assault counts, twenty years for each of the indecency counts, and five years for bail jumping, with all three sentences to run concurrently.  We will discuss the facts of this case with regard to each point on appeal.

LEGAL & FACTUAL SUFFICIENCY

In his first two points, Appellant complains that the evidence was legally and factually insufficient to support his conviction for bail jumping.

Standard Of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 
Tex. Code Crim. Proc. Ann. 
art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case.  
Malik v. State
, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); 
Bowden v. State
, 166 S.W.3d 466, 470 (Tex. App.—Fort Worth 2005, pet. ref’d).  Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State’s theories of liability, and adequately describes the particular offense for which the defendant was tried. 
Gollihar v. State
, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); 
Malik
, 953 S.W.2d at 240.  The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument.  
See Curry
, 30 S.W.3d at 404.

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.  
Watson v. State
, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); 
Drichas v. State
, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder’s determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust.  
Watson
, 204 S.W.3d at 414-15, 417; 
Johnson v. State
, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict.  
Watson
, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court “harbor a subjective level of reasonable doubt to overturn [the] conviction.”  
Id
.  We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury’s resolution of a conflict in the evidence.  
Id
.  We may not simply substitute our judgment for the fact-finder’s.  
Johnson
, 23 S.W.3d at 12; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a different result is appropriate, we must defer to the jury’s determination of the weight to be given contradictory testimonial evidence because resolution of the conflict “often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.” 
 Johnson
, 23 S.W.3d at 8.  Thus, we must give due deference to the fact-finder’s determinations, “particularly those determinations concerning the weight and credibility of the evidence.”  
Id
. at 9.

Failure To Appear

Appellant complains that the evidence was not legally and factually sufficient to convict him of bail jumping because the clerk of the court at trial was unable to find any documentation indicating that Appellant had been notified of the March 29, 2005 court date alleged in the indictment and nothing in the trial docket indicated that he was supposed to appear on March 29, 2005.

A person commits the offense of bail jumping if he has been lawfully released from custody with bail on the condition that he subsequently appear and then he intentionally or knowingly fails to appear in accordance with the terms of his release.  
See
 
Tex. Penal Code Ann
. § 38.10(a).  It is a defense to prosecution for this offense if the actor had a reasonable excuse for his failure to appear.  
See id
. § 38.10(c).

A copy of Appellant’s bond agreement pertaining to the aggravated sexual assault and indecency charges was admitted into evidence at trial.  On its face, the bond agreement states “Appearance Bond Instanter,” and it requires Appellant’s appearance “instanter before the court . . . and there remain from day to day and from term to term of said court, until discharged by due process of law . . . .”  This language in the bond agreement directed Appellant to appear instanter in the trial court, and it constituted a prima facie showing that Appellant had notice of the proceedings at which he failed to appear. 
 See Euziere v. State
, 648 S.W.2d 700, 702 (Tex. Crim. App. 1983) (stating that wording in a bond directing defendant to appear instanter provided him with sufficient and proper notice; no evidence was presented to the contrary); 
Richardson v. State
, 699 S.W.2d 235, 238 (Tex. App.—Austin 1985, pet. ref’d) (holding that evidence presented to show defendant had no actual notice was sufficient to defeat prima facie showing; defendant, his wife, and his bondsman testified that they received no notice, and court coordinator testified that no effort was made to notify defendant of the hearing).  The prima facie showing satisfies the State’s burden of proving a culpable mental state in the absence of any evidence to the contrary.  
See Burns v. State
, 958 S.W.2d 483, 488 (Tex. App.—Houston [14th Dist.] 1997, no pet.); 
Richardson
, 699 S.W.2d at 238.

Because it was shown during trial that Appellant had been released on an instanter bond, Appellant had to bring forth evidence that he did not receive actual notice.  
See Richardson
, 699 S.W.2d at 238.  Only if there was some proof that Appellant did not have actual notice did the State then have to produce evidence sufficient to justify a rational trier of fact in finding either that Appellant did have actual notice or that he engaged in a course of conduct designed to prevent him from receiving notice.
  See Etchison v. State
, 880 S.W.2d 191, 192 (Tex. App.—Texarkana 1994, no pet.); 
Richardson
, 699 S.W.2d at 238.

Appellant contends that the absence of a notation on the docket sheet that the case was set for any type of hearing or docket on March 29, 2005, was sufficient to overcome the instanter bond’s prima facie proof.  He also argues that the prima facie showing was overcome by the court clerk’s testimony that the records indicated that he had been notified to appear in court for trial on April 4, 2005, and for a pretrial hearing on March 16, 2005, but that nothing in the records indicated that he had been notified to appear in court on March 29, 2005.  Assuming arguendo that this was sufficient evidence to defeat the instanter bond’s prima facie showing and to shift the burden back to the State, we review the evidence presented at trial to determine whether it was legally and factually sufficient for the jury to conclude that Appellant did have actual notice or that he engaged in a course of conduct designed to prevent him from receiving notice.  
See Richardson
, 699 S.W.2d at 238.

Charlotte Crow, the court clerk, testified that Appellant’s trial was set for March 29, 2005, and that Appellant did not appear that day and his bond was “held insufficient.”  When asked whether she had a copy of the trial setting notice that was to be sent to the Appellant’s trial attorney, Crow checked the file and then testified that it did not appear to be in the file, but that “we don’t typically leave a copy of the setting notice in the file itself unless it is returned due to change of address.”
(footnote: 4)  The trial docket shows a notation that Appellant’s bond was held insufficient on March 29, 2005, and that a warrant was issued. Crow did testify that there was a setting notice sent out for an April 4 trial date and for a March 16 hearing date, but she also testified that her records indicated that Appellant had a court setting on March 29.  The State’s attorney asked Crow whether, if April 4 were the correct date, Appellant would have been required to show up that day as well, even if he was out of the country. Crow replied, “That’s correct.”  The trial court granted without objection the State’s request that it take judicial notice that Appellant’s trial on the aggravated sexual assault and indecency charges had been set for March 29, 2005.

An official from the Department of Homeland Security (“DHS”), Immigration Customs Enforcement division, testified that he arrested Appellant on April 7, 2005, at Chicago O’Hare International Airport.  The official testified that he intercepted Appellant on Appellant’s return flight from Bombay, India, and that Appellant did not resist arrest when he was informed that there was a warrant from Texas for his arrest.
(footnote: 5)  The official testified that Appellant admitted that he had driven from Fort Worth to Chicago.

Appellant did not testify at trial.  Appellant’s wife, Mainaz Staggs, testified that Appellant went to India because he was afraid,
(footnote: 6) and that when he landed in India, he tried to get a return ticket immediately, but that it was around seven days later before he could get a return flight.  She testified that if he had been able to get a return flight immediately, that he would have been back before April 4.

The trial court instructed the jury that they were not required to accept the judicially-noticed trial date as conclusive.
(footnote: 7)  Without reaching the issue of whether judicial notice was appropriate under these circumstances,
(footnote: 8) we conclude that the evidence presented at trial was both legally and factually sufficient for the jury to find that Appellant intentionally or knowingly failed to appear in accordance with his bond agreement either because he did not overcome the presumption that he received actual notice or because the State met its burden to show that he either did receive actual notice or engaged in a course of conduct designed to prevent him from receiving notice.  
See Richardson
, 699 S.W.2d at 238.

Viewing the evidence in the light most favorable to the verdict and resolving any inconsistencies in its favor, the jury could have disregarded the absence of a “Trial Docket” notation on the docket sheet for March 29, 2005, when no explanation was given at trial as to the notation’s meaning.  The jury could have chosen to believe Crow’s testimony that her records indicated that Appellant had a court setting on March 29 and that the absence of a copy of the trial setting notice sent to Appellant’s attorney proved that it actually was delivered, based on her explanation that such copies typically were not left in the file unless returned due to change of address.

The jury could have chosen to believe that Appellant had engaged in a course of conduct designed to prevent him from receiving notice by fleeing to India, based on the DHS official’s testimony about arresting Appellant on April 7 at Chicago O’Hare International Airport, Crow’s testimony about April 4 as a trial setting,
(footnote: 9) and Mainaz’s testimony that Appellant did go to India and that it was a week before he could get a return flight.  The jury could have chosen to disbelieve her testimony that Appellant would have been back before April 4 if he had been able to get an earlier return flight.  
See Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Margraves
, 34 S.W.3d at 919; 
Curry
, 30 S.W.3d at 406.  Reviewing all of the evidence in a neutral light and giving due deference to the jury’s determination, we reach the same conclusion as to factual sufficiency because we cannot say, on these facts, that the jury’s determination that Appellant committed the offense of bail jumping was clearly wrong or manifestly unjust.  
See Watson
, 204 S.W.3d at 414-15, 417.  We overrule Appellant’s first two points.
(footnote: 10)
JURY INSTRUCTION

In his third point, Appellant complains that the trial court erred by instructing the jury that they could consider evidence of extraneous offenses allegedly committed by Appellant in “determining the credibility of the defendant in connection with the offense” because Appellant did not testify. Appellate review of error in a jury charge involves a two-step process.  
Abdnor v. State
, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  Initially, we must determine whether error occurred.  If so, we must then evaluate whether sufficient harm resulted from the error to require reversal.  
Id
. at 731-32.

Presence Of Error

If there is error in the court’s charge but the appellant did not object to it at trial, we must decide whether the error was so egregious and created such harm that the appellant did not have a fair and impartial trial—in short, that “egregious harm” has occurred.  
Almanza v. State
, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh’g); 
see 
Tex. Code Crim. Proc. Ann. 
art. 36.19 (Vernon 2006); 
Hutch v. State
, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). It is undisputed that Appellant did not object to the contested jury instruction at trial.

The trial court charged the jury with the following instruction:

You are instructed that if there is any testimony before you in this case regarding [Appellant’s] having committed an offense other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that [Appellant] committed such other offense, if any was committed, and then you may only consider the same 
in determining the credibility of [Appellant] in connection with the offense
, if any, alleged against him in the indictment in this case and for no other purpose.

[Emphasis added.]

Appellant is correct in that, because he did not testify at trial, his credibility as a witness was not a contested issue.  
Cf.
 
Tex. R. Evid. 
404.  A correct extraneous offense limiting instruction would have made reference to one of the proper purposes for which such evidence could be used under the facts of this case.  
See id.
  Appellant did not request any limiting instructions at the time any of the extraneous offense evidence was admitted, so the evidence was admitted for all proper purposes.  
See
 
Hammock v. State
, 46 S.W.3d 889, 895 (Tex. Crim. App. 2001) (stating that without request for a limiting instruction at the time evidence is admitted, evidence is admitted for all purposes); 
see also 
Tex. R. Evid
. 404(a) (stating that evidence of conformity is not admissible without meeting one of the exceptions).

We hold that the trial court erred by charging the jury that any extraneous offense testimony could be considered in determining Appellant’s credibility in connection with the offenses.  Because Appellant’s credibility was erroneously placed in issue, we must evaluate whether the trial court’s instruction caused egregious harm.  
See Abdnor
, 871 S.W.2d at 731.

Egregious Harm

In making an “egregious harm” determination, “the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.”  
Almanza
, 686 S.W.2d at 171; 
see generally Hutch
, 922 S.W.2d at 172-74.  The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused.  
Almanza
, 686 S.W.2d at 174.  Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis.  
Ellison v. State
, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002); 
Hutch
, 922 S.W.2d at 171.  Errors resulting in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory.  
Hutch
, 922 S.W.2d at 171.

Entire Jury Charge

Appellant asserts that, because he did not testify, “to the extent that this instruction could be characterized as inviting the jury to weigh Appellant’s ‘credibility’ as a witness, it amounted to an improper invitation to consider Appellant’s assertion of his Fifth Amendment privilege as a circumstance against him.”  Appellant also complains that the challenged instruction was akin to an improper comment on the weight of the evidence.

With regard to comment or invitation to consider a defendant’s failure to testify, the offending language must be viewed from the jury’s standpoint, and the implication that the comment referred to the defendant’s failure to testify must be clear.  
See Bustamante v. State
, 48 S.W.3d 761, 764-65 (Tex. Crim. App. 2001).  It is not sufficient that the language might be construed as an implied or indirect allusion; the test is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant’s failure to testify.  
Id
. at 765.  In applying this standard, the context in which the comment was made must be analyzed to determine whether the language used was of such character. 
 Id
.

The challenged language, “in determining the credibility of [Appellant] in connection with the offense,” does not direct the jury’s attention to Appellant’s failure to testify or appear to be of such a character that the jury would necessarily and naturally take it as a comment on his failure to testify.  
Id
.  In contrast, the paragraph immediately preceding the challenged instruction provided,

In a criminal case the law permits a defendant to testify in his own behalf but he is not compelled to do so, and the same law provides that the fact that a defendant does not testify shall not be considered as a circumstance against him.  You will, therefore, not consider the fact that the defendant did not testify as a circumstance against him; and you will not, in your retirement to consider your verdict, allude to, comment on, consider, or in any manner refer to the fact that the defendant has not testified. 

The remainder of the jury instructions consisted of the charges; the substantive law; definitions of the offenses at issue; and explanations of what the State had and did not have to prove,
(footnote: 11) how to apply the law to any facts that they found beyond a reasonable doubt, the presumption of innocence, that the indictment did not constitute evidence of guilt, and how to communicate with the trial court.  The trial court also gave the customary instruction that the jurors were the exclusive judges of the facts proved, the credibility of the witnesses, and the weight to be given to the testimony.

On appeal, we generally presume that the jury follows the trial court’s instructions in the manner presented.  
Thrift v. State
, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).  To rebut this presumption, the appellant must point to evidence that the jury failed to do so.  
Id
.  Here, the jury’s attention was not directly focused by the challenged instruction on Appellant’s failure to testify, and the jury received an explicit instruction not to consider Appellant’s failure to testify.  As there is nothing in the record to indicate that the jury failed to follow the trial court’s express instruction not to consider Appellant’s failure to testify, and Appellant himself has directed us to no evidence to show otherwise, we conclude that the challenged instruction did not constitute an improper invitation to consider his failure to testify when considered in light of the entire charge.  
See Bustamante
, 48 S.W.3d at 764-65
.

Turning to Appellant’s argument that the instruction constituted a comment on the weight of the evidence, we consider the court’s charge as a whole when determining whether an instruction is such a comment.  
Russell v. State
, 749 S.W.2d 77, 79 (Tex. Crim. App. 1988).  An instruction constitutes a comment on the weight of the evidence if it furnishes a standard by which the jury should weigh the testimony or if it authorizes the jury to act arbitrarily in passing on the credibility of a witness.  
Id
.

Reviewed in light of the whole charge, including the general instruction that the jury was the exclusive judge of the credibility of the witnesses and the weight to be given to their testimony, and when examined in light of the evidence presented at trial, addressed in more detail below, we conclude that the complained-of instruction provided no comment on the weight of the evidence.  
See id. 
 The instruction itself constituted a nullity because Appellant did not testify.  
Because he did not testify, the jury was unable to interpret the instruction as the trial judge’s personal opinion as to truth or falsity of any evidence directly provided by Appellant, or a comment on his credibility.  
See id. 
at 78.  We will continue to consider whether the impact of this null instruction constituted egregious harm within our analysis below of the evidence presented at trial.

State Of The Evidence

Contested Issues
 

The contested issues at trial pertained to Appellant’s guilt with regard to committing the offenses of aggravated sexual assault of a child and indecency with a child with the complainant, B.L., alleged to have been committed on or about July 12, 2003, and bail jumping.  We have already addressed the sufficiency of the evidence provided by the State with regard to bail jumping.

To prove the three aggravated sexual assault charges, the State had to bring forth evidence for the jury to find beyond a reasonable doubt that Appellant had intentionally or knowingly caused the penetration of B.L.’s sexual organ by inserting his finger into her female sexual organ, caused the penetration of B.L.’s mouth by Appellant’s sexual organ, and caused B.L.’s sexual organ to contact Appellant’s sexual organ, and that B.L. was younger than fourteen when Appellant’s conduct occurred.  
See
 
Tex. Penal Code Ann
. § 22.021(a)(1)(B)(i)-(iii), (2)(B).  To prove the two indecency charges, the State had to bring forth evidence for the jury to find beyond a reasonable doubt that Appellant had engaged in sexual contact with B.L. by touching any part of B.L.’s genitals and by exposing his genitals to her with intent to arouse or gratify his sexual desire, that B.L. was younger than 17 years old when Appellant’s conduct occurred, and that B.L. was not his spouse.  
See id.
 § 21.11.

Evidence At Trial

The testimony at trial centered primarily around events during the spring and summer of 2003, when B.L. was twelve years old.  During the State’s case-in-chief, B.L.’s aunt, Delia Heizer, the outcry witness, testified that B.L. told her in July 2003 “that there was this man who she loved and he loved her,” that they had had a sexual relationship, that he had promised he would marry her as soon as his wife died, and that it was clear that B.L. was talking about Appellant.  B.L.’s mother testified that B.L. had never been married or married to Appellant.

B.L. testified that she had been friends with Appellant’s daughters, Jaime and Jasmin, that the first time she spent the night at their house, Appellant gave her orange juice and vodka to drink, and that she, Jasmin, and Appellant would drink alcohol together when she went over to Appellant’s house at night. She testified that, when asked by police on May 12, 2003, about drinking alcohol at Appellant’s house and whether Appellant had touched her inappropriately, she lied to the police.  But she also testified that prior to May 12, there had been nothing more aggressive by Appellant than comments and touching her bottom.
(footnote: 12)  She testified that after May 12, Appellant promised to get her belly button pierced, something she wanted, and that he started touching her more often and in more private places, including her breasts “every time [she] was over there.”  She testified that she performed oral sex on Appellant one night after “he pulled it out of his pants and told [her] to give him head,” that Appellant penetrated her vagina with his penis one night after he removed her shorts and underwear, and that Appellant penetrated her vagina with his finger.

The State’s remaining witnesses during its case-in-chief were the Bedford police detective who began investigating the offense in August 2003, Elaine Rosene, another minor, and the Tarrant County deputy who retrieved Appellant from Chicago in April 2005.  Elaine testified that B.L. spent a lot of time at Appellant’s house, that Appellant served them alcohol one night—she received it in ice cream and B.L. received it in orange juice—and that, after May 12, 2003, Elaine was no longer welcome at Appellant’s house.  Elaine made a complaint to the police in May 2003 stating that she had witnessed Appellant and Jaime touching inappropriately at Elaine’s house, with Jaime’s hand touching Appellant’s penis for ten to fifteen minutes.
(footnote: 13)  Elaine testified that Jaime was unwilling to report this.

Appellant’s witnesses included the Bedford police officer who took B.L.’s contradictory statements in May and in July 2003,
(footnote: 14) B.L’s classmates Holly Mayhew, Anthony Cervantes, and Epiphany Bray, the sexual assault nurse examiner, Appellant’s wife and daughters, two friends of the family, and Chris Marquez, who had dated both B.L. and Jasmin.

Holly testified that B.L. said B.L.’s father raped her and that Epiphany was present when B.L. told her this.  Epiphany testified that Holly was present, but that when Epiphany asked B.L. whether it was true that her father raped her, B.L. replied, “no, it was a guy named Craig [Appellant’s first name].”  Epiphany elaborated that “[B.L.] said that it was one of her friend’s dad[].”  Anthony, who dated B.L. for around five months, testified that B.L. told him that she had been raped by the father of a different friend, Kayla.

The sexual assault nurse examiner testified that B.L. told her during her medical history about the vaginal intercourse and that “[Appellant’s] 16-year-old and his 11-year-old daughter had told her that he abused them also.”  She testified that B.L. did not have a hymen, which indicated “chronic penetration”—penetration more than one time—which she found inconsistent with B.L.’s statement.
(footnote: 15)  She also testified that she did not remember asking B.L. about the inconsistency, that B.L. named Appellant, a white male, age forty, as the culprit, and that B.L. seemed embarrassed, which she testified was a common feature in her training and experience with adolescent females.

Mainaz, Jasmin, and Jaime testified in Appellant’s defense.  Mainaz testified that B.L. told her the first time she met her that B.L. had been sexually molested by her father.
(footnote: 16)  Mainaz testified that when she found out that Chris, then eighteen, was dating B.L., she called him to let him know that B.L. was twelve. Chris then broke up with B.L., and Mainaz testified that this was B.L.’s motivation to make her allegations against Appellant.  She also testified that two of Appellant’s friends did act inappropriately with minors, including B.L. She reported this to the police several months after Appellant’s indictment, testifying that she took Jasmin to make a police report as soon as she found out.  Mainaz testified that Jaime’s depression after May 2003 and into the school year of 2004 was because of Mainaz’s illness, and that Jaime did say, “I have access to a gun, I’ll kill myself,” but “[a]ll the—most kids do that, they say that.”  Mainaz had been ill with hepatitis C and started taking medication to treat it at the end of May 2003, which “slowed [her] down.”  She also testified that Appellant told her that he did not commit the crime and that he fled to India because “they were going to try to put him in prison for the rest of his life.”

Jaime denied making the statement about a gun and testified that B.L. and Elaine were both liars and that her father had never touched her.  With regard to her suicidal thoughts, she testified that she “was just going through a hard time, and [she] thought [her] life wasn’t going to get any better, and [her] mom was a little sick.”  Both Jaime and Jasmin testified that B.L. told them that B.L.’s father abused her.
(footnote: 17)  Jasmin testified that she made milkshakes with vanilla extract when Christine, Jaime, and Tara were at her house.

Tara Schweyher, a friend of Jaime’s, testified that in 2002 or 2003 she spent the night at Appellant’s house with Jaime, Christine, B.L., and Elaine and that Jasmin made milkshakes with vanilla extract that tasted bad.  Tara testified that B.L. told her that her father had molested her.  Shalinta Jean-Baptiste, Appellant’s oldest daughter’s best friend, testified that she spent a lot of time at Appellant’s house in the summer of 2003 and never saw children drinking alcoholic beverages there or Appellant act inappropriately around B.L., and that B.L. “lied a lot.”  She also testified that one of Appellant’s friends, Shawn, did interact inappropriately with B.L.  Chris testified that he was eighteen when he dated B.L. for around a week and broke up with her when Mainaz told him B.L.’s real age.

In rebuttal, the State produced Christine, another minor, and Tammy Koolbeck.  Christine testified that she made a police report in March 2002 and that she did not know B.L., but did know Elaine.  She testified that she had been friends with Jaime and when she spent the night at Appellant’s house, Appellant gave her ice cream that tasted like it had alcohol in it.  She testified that Appellant had mentioned alcohol earlier that evening, asking them if they wanted any “because it wasn’t a party without it.”  After the ice cream was served, Appellant joined her, Jaime, and his son in a game of truth or dare. Christine testified that Appellant dared her to take off her bra, to kiss his son, to run around the swimming pool in her bra with her shirt off, and to lick the back of the car.  She complied with all of the dares.

Koolbeck testified that she had been Jaime’s guidance counselor and knew B.L., Elaine, and Tara.  She testified that Jaime’s parents were not very involved in Jaime’s academic life and that when Jaime commented to her that she was suicidal in January 2004, although Koolbeck informed Mainaz, Mainaz did not come to the school that day and Koolbeck had someone else’s parent agree to watch Jaime for twenty-four hours.  She also testified that as to Tara’s reputation for truthfulness at school, “truthful would not be an adjective that we would use as a faculty,” and that they had lots of trouble at school with lies.  In rebuttal, the defense brought Tara back to testify that Christine was at Appellant’s house the night she was there and that Tara was not lying.

Weight Of Probative Evidence

The jury, as a rational trier of fact and the sole judge of the evidence’s weight and credibility, could have found the essential elements of aggravated sexual assault and indecency beyond a reasonable doubt, based on the testimony at trial.  
See Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789;
 Hampton
, 165 S.W.3d at 693; 
Margraves
, 34 S.W.3d at 919.  The jury heard testimony from B.L. that she was twelve years old when Appellant penetrated her vagina with his finger and his penis and put his penis in her mouth.  
See
 
Tex. Penal Code Ann. 
§ 22.021(a)(1)(B)(i)-(iii), (2)(B).  The jury also heard B.L. testify that Appellant frequently touched her breasts and other private areas after May 12 and exposed his genitals to her before demanding oral sex, and B.L.’s mother testified that B.L. had never been married to Appellant.  
See id
. § 21.11.  If the jury chose to believe B.L.’s testimony beyond a reasonable doubt, after evaluating her demeanor and her
 
credibility in light of the testimony of all of the other witnesses, then this evidence alone would have been sufficient to convict Appellant.  
Johnson
, 23 S.W.3d at 8.

The Argument Of Counsel 

After the trial court read the charge to the jury, the State argued the motivation behind each witness’s testimony.  It argued that the motivation behind Jasmin and Jaime’s testimony was to keep their father from being convicted.  It argued that Elaine received nothing but ridicule and interrogation for reporting Appellant’s interaction with Jaime and that Elaine’s testimony was true.  It argued that Christine, who did not know B.L., had a similar experience the year before and told the truth about it.  It argued that B.L.’s testimony should be believed, in spite of some of B.L.’s bad decisions in the past.

Appellant countered by attacking the relevance and reliability of the testimonies by Christine, Elaine, and B.L., stating that Christine and Elaine’s testimonies “didn’t give us one bit of evidence that showed that [Appellant] did anything to [B.L.].”  He attacked B.L.’s mother’s testimony with regard to her ability to trust her daughter and B.L.’s aunt’s testimony with regard to the actual information contained within B.L.’s outcry statement.  He argued about the lack of investigation by the Bedford police and returned to B.L.’s credibility, stating, “Can you believe anything that girl said?” and made reference to inconsistencies in B.L.’s testimony when contrasted with testimony from the nurse, the police officer, and Elaine.

The State closed with a review of the case’s timeline, starting with Christine’s testimony about similar events a year before, Elaine’s police statement in May, B.L.’s outcry in July and her rape examination in August, Jaime’s subsequent suicidal thoughts, the police report filed by Mainaz on Appellant’s friend with regard to B.L. seven months after Appellant was indicted, and Appellant’s flight to India.

Other Relevant Information

Appellant claims that his credibility was not an issue, such that the challenged instruction was an improper invitation to consider his extraneous bad acts to establish conformity with his bad character.  He lists the following as the evidence of extraneous bad acts presented at trial: “routinely serving alcohol to minors, playing ‘truth or dare’ in a sexually explicit manner with Christine Benavides, and carrying on a sexual relationship with his twelve year old daughter, [Jaime],” and asserts that the instruction constituted an invitation to the jury to consider this evidence “for the purpose of establishing his bad character and his conformity with that bad character.”

Rule 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith.  
Tex. R. Evid. 
404(b).  However, it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident.  
Id
.  Outside the jury’s presence, the State and Appellant argued the admissibility of witnesses for the State and for the defense.  With regard to the State’s witnesses, the State argued for the admissibility of testimony by Christine and Elaine under the rule 404(b) exception for modus operandi, intent, and motive.  
See id
. Appellant’s defense counsel argued to the trial court that Christine’s testimony was extraneous, and the trial court agreed at that time, but it later allowed her testimony in rebuttal after the defense rested, without objection.  Elaine’s testimony was allowed during the State’s case-in-chief.
(footnote: 18)

Analysis

The State’s argument to the jury mirrored its rule 404(b) theory to the trial court with regard to the admissibility of Christine and Elaine’s testimonies under rule 404(b).  Neither the State nor defense counsel addressed Appellant’s failure to testify on his own behalf during closing arguments.  Because there was no testimony by Appellant, there was nothing for the jury to consider with regard to his credibility as a witness.  Omitting the part of the instruction that did not apply, the jury’s instruction read,

You are instructed that if there is any testimony before you in this case regarding [Appellant’s] having committed an offense other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense, if any was committed
, and then you may only consider the same in determining the credibility of [Appellant] in connection with the offense, if any, alleged against him in the indictment in this case and for no other purpose
.

Nothing in the plain language of the instruction makes any reference to conformity and bad character.  The State’s closing argument drew parallels between Christine and Elaine’s testimonies as demonstrations of modus operandi and intent, but not to Appellant’s bad character.  And the jury also received the customary instruction that it was the exclusive judge of the facts proved, the credibility of the witnesses, and the weight to be given to the testimony, and, presumably, applied this instruction to the testimony of the witnesses brought before it.  
See Thrift
, 176 S.W.3d at 224.  To rebut this presumption, Appellant must have directed us to evidence in the record that the jury failed to do so, and he has not.
(footnote: 19)  
See id.

“Egregious” harm is present when the case for conviction was actually made clearly and significantly more persuasive by the error.  
See Saunders v. State
, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991).  While the testimony of Christine and Elaine might have warranted the request for a limiting instruction by Appellant, his defense counsel made none.  While Christine and Elaine’s testimony may have made it more likely for the jury to conclude, per the State’s closing argument, that Appellant’s modus operandi involved giving alcohol to minors, and that Appellant’s intent was to have sexual contact with minors, we cannot say that it was clearly and significantly more persuasive than B.L.’s direct testimony, which, if believed by the jury, would have been legally and factually sufficient to convict Appellant of aggravated sexual assault and indecency with a child.  
See Saunders,
 817 S.W.2d at 692; 
see also Margraves
, 34 S.W.3d at 919; 
Johnson
, 23 S.W.3d at 8.

Upon comprehensive review of the record, we conclude that the instruction was an inconsistency that created a null instruction to the jury in light of the entire charge, and did not affect the very basis of Appellant’s case, i.e., his guilt or innocence in light of all of the evidence, or deprive him of a valuable right, i.e., the privilege against self-incrimination, or affect any defensive theory, i.e., that Appellant was not guilty and that the complainant was a liar.  
See Hutch
, 922 S.W.2d at 171.  Therefore, though the instruction was error, it did not cause the egregious harm that would require reversal.  
See Abdnor
, 871 S.W.2d at 731; 
Almanza
, 686 S.W.2d at 171.  We overrule his final point.

CONCLUSION

Having overruled all of Appellant’s points, we affirm the trial court’s judgment.

DIXON W. HOLMAN

JUSTICE

PANEL A:  CAYCE, C.J.; HOLMAN and GARDNER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  June 28, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P. 
47.4.

2:
Tex. Penal Code Ann. 
§ 21.11 (Vernon 2003 & Supp. 2006) (indecency with a child); 
id
. § 22.021(a)(1)(B)(i)-(iii), (2)(B) (aggravated sexual assault of a child); 
id
. § 38.10(a) (bailjumping).

3:
Based on the trial docket, it would appear that there were actually two mistrials.  The first, on May 16, 2005, was declared without explanation in the record after pretrial motions were heard.  The second, on May 19, 2005, was declared due to a hung jury.

4:
Crow added, “We usually have one posted in our office on the wall.”  The trial court recessed briefly to allow Crow the opportunity to check for a posting on the wall of Crow’s office.  No further testimony was given about the wall posting.

5:
He also testified that Appellant had been carrying one suitcase containing personal items, a computer, and approximately five thousand dollars.

6:
Mainaz testified that Appellant told her that he did not commit the crime “and they were going to try to put him in prison for the rest of his life.”

7:
“The jury is instructed that the Court has taken judicial notice that Cause No. 0915900 was set for jury trial on March 29, 2005.  The jury is further instructed that it may but is not required to accept as conclusive, the fact judicially noticed.”

8:
Under the Texas Rules of Evidence, a judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  
Tex. R. Evid. 
201(b). 

9:
April 4, 2005 
is
 stamped with “Trial Docket” on the trial docket sheet. With regard to the date “on or about” in an indictment, in which the indictment alleges an offense to have been committed, the State is not bound by that date as long as that date is anterior to the presentment of the indictment and not so remote that the prosecution of the offense is barred by limitation.  
Tex. Code Crim. Proc. Ann. 
art. 21.02, § 6 (Vernon 1989) (stating the requisites of an indictment); 
Mitchell v. State
, 330 S.W.2d 459, 462 (Tex. Crim. App. 1959). Appellant’s indictment for bail jumping stated that, “on or about the 29th day of March 2005,” after being lawfully released from custody on the pending aggravated sexual assault charge on the condition that he subsequently appear in court, that Appellant intentionally or knowingly failed to appear in accordance with those terms, specifically, that Appellant was “ordered to appear for trial 
on or about 
the 29th day of March, 2005 and . . . fled the State of Texas and failed to appear for said trial.”  [Emphasis added.]  Appellant was indicted by grand jury of the bail jumping charge in May 2005.

10:
Because we overrule these two points, we need not address Appellant’s related sub-point, in which he contends that his other convictions should be reversed because “[t]he bail jumping case was an extraneous offense with regard to the child sex offenses alleged in cause number 915900D,” supported by insufficient evidence.  
Tex. R. App. P. 
47.1.

11:
For example, with regard to the sexual offense charges, the trial court instructed the jury that 

the State is not required to prove the exact date alleged in the indictment, but may prove the offenses, if any, to have been committed at any time prior to the presentment of the indictment so long as said indictment is presented within ten years of the 18th birthday of the victim of the offense.

12:
B.L. testified that Appellant’s comments included statements that he loved her and he wanted to marry her and that he would marry her when his wife died.  She testified that he also told her “that he would rather make love to me than just have sex.”  She testified that she had a crush on him and that she believed that he was going to marry her when his wife died.

13:
Elaine testified that she had been staying at Appellant’s house when her father was out of town and they had taken her to her house to feed the cats. 

14:
B.L. told the officer on July 28 that she had been provided alcohol, “the complete opposite of what she told [her] on the 12th [of May].”

15:
She testified that she wrote down that it was inconsistent “[b]ecause I don’t think she told me that it was that she had any penile/vagina penetration that many times for her hymen to be worn” and she felt that B.L. was untruthful about the amount of times that she was penetrated.

16:
Mainaz testified that she did not report this to the police because she said B.L. told her that the police had already been called and that her mother knew about it.

17:
Jaime testified that B.L. said that B.L.’s father raped her, while Jasmin testified that B.L. said that he abused her, but did not tell her that B.L.’s father had sexually abused her.

18:
Appellant does not complain on appeal about the actual admission of the extraneous offense evidence or the absence of a proper limiting instruction in the jury charge.  He only complains about the language used in the actual limiting instruction.

19:
This presumption does not apply to proving harm from error, because neither the State nor Appellant has the burden to prove harm from charge error.  
Ovalle v. State
, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000).  Instead, it is our duty to assess harm from the context of the error.  
Id
.  However, the party making the argument still must suggest, in light of the record, how prejudice may or may not have occurred and 
provide us with a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.  
Tex. R. App. P. 
38.1(h)
; 
Ovalle
, 13 S.W.3d at 787.